Case number 22-2210 from Southern Iowa, United States v. Gary Elliott, Sr. This case arises out of a series of violations of Mr. Elliott's constitutional rights by the Des Moines Police Department. These violations led to the illegal seizure and interrogation of Mr. Elliott without proper Miranda warnings, as well as two illegally obtained warrants to search his property. I'm going to start with the illegal seizure and what we have actually called the de facto arrest that occurred on Mr. Elliott on February 4, 2021. Lozano tells us that a seizure occurs when an officer, by means of force or authority, has in some way restrained the liberty of a citizen. It is a totality of the circumstances test and basically we look at would that person feel free to go about their business and disregard the police. So the first thing we're going to have to establish is that there's actually been a seizure of Mr. Elliott. Well, the facts are largely not disputed in this case. As we can see them on RDOC 64-4, our Exhibit D, that being Officer Valentine's body camera. There were other ones that were submitted as well, but this one seemed to capture most of the events. Three armed police officers descended upon Mr. Elliott, pulled him out of his vehicle, immediately handcuffed him, and began questioning him about his presence there and the presence of any weapons within his vehicle. Now, we could go through the factors that the court has set, but I think we can all agree that at that point in time, as he's cuffed outside of his vehicle and then taken away from his vehicle, that Mr. Elliott did not feel free to just say, okay, you guys take these cuffs back and I'm going to leave now. He was seized. There's no question in that. So then the question becomes, did the officers have the right to do so? Now, underneath the Terry stop, we acknowledge, as did the district court, that the judges can temporarily handcuff a defendant underneath the Terry stop for the officer's safety or to essentially keep the status quo. But there's got to be a reason to do it. There has to be some reason the officers feel that that person is armed and dangerous or going to cause some sort of a generalized danger to the general public. In this case, that simply wasn't present. What we had is we had the bare assertion that Mr. Elliott had been making some threats and that because he's a felon, he's armed with a weapon. We'll get to why that's counterintuitive here in a moment. That's essentially what they had. At the point in time, they brought him out of the vehicle and patted him down, and then Officer Valentine took his flashlight and went around the vehicle and searched in the windows and found no weapons. At that point in time, even if for that split second they believed he was at risk, that risk has now dissipated. We know him not to be armed. Furthermore, they moved him several feet, if not 10 yards, away from that vehicle. So we know now he has no armament on him, and we know that he has no access to the arms that may be inside the vehicle. At that point in time, he is illegally seized, and not for any reasons the officers have to do so. You don't think there was reasonable suspicion at that point to believe that he posed a threat and may have committed a crime? There may be reasonable suspicion that he had committed a crime, because we do have the reports that he was sending threatening messages and that he, I think they had said at some other time, not necessarily related to this, held a gun to somebody's head and some things of that nature. But the issue isn't whether they have reasonable suspicion to be just talking to him at this point, as they do. Our point is that they are exceeding the scope of that by continuing to have him in what is a de facto arrest, being removed from his vehicle and cuffed, as there's clearly no officer safety issue, as we know him not to be armed during the search. It's all plain, there is no officer safety issue. I mean, you've got to start off with this, what do we have? First of all, we have a statement where you'll find him. He was found there. Then we have a statement that says he's threatened to kill people, and we have a statement that says he's armed, right? Now, isn't it perfectly reasonable to move him away from the car, where there might be a weapon? I mean, at this point, nobody's done a complete search of the vehicle, doesn't know what's in there, and to handcuff him just to make sure that he doesn't act upon the threats that are there while they sort out exactly what happened? I mean, it wasn't held out there for hours in this condition. So, I mean, how is it – I'm just having a hard time with the idea that all of a sudden this guy is posing absolutely no risk and we're supposed to let him just wander around without anybody trying to preserve the status quo? Sure. Well, I don't think wandering around, I mean, if you were to wander back to his vehicle, of course, I think that would have been a furtive movement that would have caused there to be some further need to detain him or wonder what he was doing. But the reality was at that point in time, he was answering all their questions. We know him not to be armed, and he's removed from the vehicle. He'd have had to go through three armed police officers, all three of which, when you watched the body cam, were significantly larger than him, by the way. He would have had to get through all those people just to get to whatever weapon might be inside that vehicle. And the government points to Kent as sort of this authority that there was a reason to believe that he is armed and dangerous. However, Kent has some very distinct characteristics we do not have here. First off, in Kent, the officers were told the exact weapon and where it would be located on the person. We don't have anything like that here. The closest statement we have is that because he's a felon, I know he has a weapon. Also in Kent, the officers had personal knowledge of criminal activity by Kent as they had conducted a controlled buy on him some months prior. So they knew him and were familiar with him. The officers in this case, there's no testimony in the record that would indicate they were familiar with Mr. Elliott whatsoever. So we believe that even this initial detention exceeded the scope of what is allowed underneath the Terry stop. But if we were to look at how this now continues, I would agree it all happens very quickly. But as this continues, even if we did have reason to initially cuff Mr. Elliott, that very quickly dissipated. And exceeding that Terry stop was illegal. Now if we look at what we knew about the crimes they were investigating, we have harassment and potentially a felon in possession of a firearm. Well, the officers had asked him at that point in time if he was harassing Ms. Hanan, and he said no, we were having a conversation. They had searched him for weapons and asked him repeatedly for weapons, if he had weapons. They did not find a weapon, did not find a weapon in his car, and he denied having any weapons. At that point in time, there's no more investigation that needs to be conducted with Mr. Elliott. Now if the officers wanted to pursue those other charges, they could perhaps go and meet with these ladies and see if there's some text messages on the phone that would indicate there's additional probable cause to effectuate arrest. But what they have at that moment is they have the bare assertion of Ms. Anderson, somewhat of second-hand knowledge, and nothing that is predictive in nature. So at that point in time, Mr. Elliott should have been free to leave, and he wasn't. And here's where we get even more egregious. Where we get even more egregious is these officers begin to then interrogate Mr. Elliott. Now, the state concedes, or the government concedes, that the defendant was in custody for purposes of Miranda. So the fighting issue really becomes whether the officer's questions rose to the level of interrogation. Cowan tells us a question is an interrogation if it is reasonably likely to elicit incriminating information, and the officers can ask public safety questions or officer safety-related questions, and there's another case law that indicates they can ask to search without accusing the person of a crime, just simply ask to search. United Search v. Tapia Rodriguez says that interrogation is any question that is directly relevant to the substance offense charge. So let's look at some of the questions they asked. If we go to RDOC 64-4, that again is Officer Valentine's body cam, officers indicated at 131 that they were going to take the subject into custody. That's why I say that there's absolutely no dispute that he is seized at that point in time. The officers didn't say we're just going to put some cuffs on him and talk to him. They didn't say we're having a casual encounter. They said we are taking him into custody. This is a custodial interrogation. Next question at 145 is why would someone be telling us that you have a weapon? We would assert that this question is very similar to the question in Cowan, where the officer asked Mr. Cowan, why do you have keys to a vehicle that is parked outside this apartment when you told us you took a bus here? Now in that case, the court said that that question was clearly designed to elicit an incriminating response, and it suppressed the response to that question. The officers continue to question Mr. Elliott about his relationship with Ms. Hanan, how long they've been together, if they have a no contact order. All the while, the other officers were asking about these weapons. If he's armed with any weapon, are you sure you don't have any weapon? Are there any weapons we're going to find in the vehicle? Over and over and over. These questions are designed to elicit an incriminating response to either one, the nature of his relationship with Ms. Hanan, and if it's harassing in nature, or two, whether he is a felon and in possession of a firearm. At this point, the officer's safety has been secured. There is no reason to ask these questions other than those two incriminating statements. Finally, at 330, in response to the question of am I going to find any guns, knives, or bombs inside the vehicle, that is when Mr. Elliott says, no, but I might have a pot pipe in there. Now, at that point in time, he's been removed from the vehicle. He's been handcuffed for approximately three minutes. He's offered no threat to the officers. There's been no other evidence to indicate a crime is at hand or criminal activity is at foot. He's still in cuffs and he's surrounded, being hounded by three different officers' questions. This is a custodial interrogation. Now, if we look at the fact that this is a custodial interrogation, he should have been read as Miranda rights. And because he was not read as Miranda rights, his responses to these questions that were probative in nature to the criminal acts that they were trying to investigate should be suppressed, as should the search. And the district court was in error when it found that this consent was given freely, as it clearly was not. So we're asking that this court overturn the district court's decision and find that the defendant's constitutional rights, Mr. Elliott's constitutional rights, were violated by this custodial interrogation without Miranda rights. What statements did he make that are not covered by public safety, that it's not covered by the Tapia Rodriguez, that were admitted that shouldn't have been? Well, specifically, the nature of his relationship with Ms. Hanan, because she's Mac's girlfriend. That statement should not be allowed. But the one that really gets to it is the one that has to do with any guns, knives, bombs, etc., in the vehicle. Can we search it? And the statement that allows him to search, the giving of consent, that was done without – it was not freely and voluntarily given because he was not properly advised into Miranda rights and he was illegally seized at that point in time. I don't think that falls under either the public safety exception or the consent to search. It does not. Because at that point in time, the officers had been accusing him of committing crimes, and those crimes were firearm-related crimes. So we're not just talking about trying to say, hey, can we search this to make sure everybody's safe. We're talking about, can we search this to go find evidence of the crimes we are here to investigate? Okay, and what was his response to that? Did he say yes? Is that all he said?  Well, how does that harm him at trial, though? Is that incriminating that he says yes to a consent to search? It is because they find a firearm inside the vehicle. At that point in time, he's a felon in possession of a firearm. He's in place under arrest. That's then used to gain a subsequent warrant later on, which we'll talk about. So I do want to take my attention to the warrants if we could for a moment. There are two warrants. They are found in RDOC 64-6 and 64-7, the first being the USB warrant. Again, we are to look at the four corners of the warrant to determine if it meets probable cause. We assert that the first warrant, the USB warrant, does not on its face make probable cause, as there's no independent corroboration of Ms. Hanan's statements. Now, one place both the government admittedly and the defense got off track in our briefing was we are arguing back and forth about whether a police report indicated that Ms. Anderson had also seen the images herself. That police report is a red herring because we are to look at the four corners of the affidavit. In the affidavit, it does not state that Ms. Anderson ever saw these images. It merely states that she was told about them by Ms. Hanan. So that's a red herring, and admittedly, our side got off track there too. But the point being is when we look at the four corners of the affidavit, no independent corroboration of Ms. Anderson, the affidavit does not stand up on its own. Furthermore, we believe we are entitled to a Franks hearing, as law enforcement deliberately and recklessly omitted information that it knew. Now, if we look at Chris Thomas' report, the criminal history of Ms. Hanan is included in Officer Allen's report. He gets that information in his report from Officer Allen's report. Officer Allen's report was viewed by Detective Bergstrom and noted in the affidavit that he reviewed that report. Therefore, we believe we prove the first element that he had knowledge of that criminal history, that being theft, other crimes of moral turpitude, and the fact that she currently had a theft charge pending. Additionally, we believe that if we were to include that information, that she had a criminal history, that that would then impugn her credibility, similar to the case of United States City Hall, as she was the only uncorroborated informant. I'm going to reserve the remaining minutes. Thank you. Ms. Perez? Good morning. May I please the court? My name is Alexa Perez, and I'm here on behalf of the United States. There are a couple of things that I want to first correct with regard to the record, and that is the question regarding consent to search Mr. Elliott's vehicle. Judge Strauss, you asked a question about what was the question and what was the incriminating response, and I just want to correct that. And that is in Record 64-4 at 320, Officer Valentine asks Mr. Elliott, if there's anything that we need to worry about in the car, guns, knives, drugs, et cetera. Mr. Elliott says no. And then Officer Valentine goes on to ask, are you okay if we just take a quick look and make sure everything is kosher in there? And that is when Mr. Elliott says, quote, yeah, I mean, there might be a pot pipe in there or something. So I just wanted to correct that before I begin. Moving on to the issue of the suppression of evidence from the February 4th interaction with law enforcement, Mr. Elliott argues that that evidence should have been suppressed because, one, he was unlawfully seized. Two, he was unlawfully interrogated without Miranda warnings. And three, his car was unlawfully searched. But the district court correctly found that Elliott was not unlawfully seized. He was subject to a valid Terry stop, and Elliott was not interrogated, so Miranda warnings were not required. Lastly, the court correctly found that Elliott provided consent to search his vehicle, and even if he didn't, his voluntary statements provided probable cause to search. Starting first with the question of the illegal seizure, the officers on February 4th had reasonable suspicion to detain Elliott based on Michelle Anderson's 911 call. That call was not anonymous. It reported an ongoing emergency and was corroborated by law enforcement. During that call, Anderson identified herself, and she also expressed a willingness to meet with officers. She reported an ongoing emergency. She indicated that she personally saw Elliott with a gun and that Elliott had threatened to kill Hannon. During that 911 call, the dispatcher asked, are you sure he has a gun or are you just assuming? And she says, I'm sure. I'm sure of it, and then goes on to ask Hannon whether or not she reported that a week or two earlier, Mr. Elliott threatened Hannon with a gun to her head. When the court listens to that call, the court will be able to hear that this was a call that was made under the stress of excitement. There was screaming. The woman was talking hurriedly. These women feared for their lives in that instance, and under this court's precedent, that type of reporting of an ongoing emergency carries with it a presumption of reliability. Ms. Anderson also provided detailed information about Elliott that suggested a familiarity with him. She reported his full name, his date of birth, his home address, and that he was a felon. She also reported and provided contemporaneous information about where Mr. Elliott was located, what type of vehicle he was driving, and the precise location where he would be located. Officers then verified that information that Anderson provided during the 911 call, including the description of Elliott's car, the precise location where it would be found, Elliott's name, and his date of birth. While this was not substantial corroboration, less corroboration was required here because Anderson was not anonymous and her report concerned an ongoing emergency. Relying primarily on two cases, Florida v. J.L. and Alabama v. White, Elliott argues that Anderson's tip was unreliable. But the key difference between those cases and this case is that this was not an anonymous tip. Additionally, Elliott argues that Anderson's report lacked any predictive information to allow law enforcement corroboration. But the corroboration that Elliott argues law enforcement should have done would almost never be possible in an emergency situation, and especially not in this one. Any kind of delay to seek additional information or corroboration could have proved costly to the public's safety. The district court, therefore, correctly found that there was reasonable suspicion to detain Elliott. Moving on next to the question of custodial interrogation, Elliott argues that he was subject to custodial interrogation without Miranda warnings and that, therefore, any incriminating statements that he made should have been suppressed. The questions that officers asked Elliott on February 4th fall into three categories. That is, first, routine identification questions, second, public safety questions, and third, a request to search. None of those lines of questions required officers to provide Elliott with Miranda warnings. I'll focus on the last two, starting first with the public safety questions. On February 4th, officers asked Elliott if he had a weapon on him or in his car. Based on Anderson's 911 call, that question was reasonably prompted by a concern for the public safety. Officers were responding to a late-night call about a man who had threatened two women with a gun and who was a convicted felon. Officers were justifiably concerned in that moment about the danger that Elliott posed to the public. Under this court's precedent, that question was well within the public safety exception. Next, the officers asked Mr. Elliott for consent to search his vehicle. And as I corrected earlier, Mr. Elliott, in response to that question, said, quote, yeah, I mean, there might be a potpipe in the car, end quote. That question did not require Miranda warnings. Moving on, then, to the search of Mr. Elliott's car. In response to that question, as I said, he said, quote, yeah, I mean, I might have a potpipe in the car. The district court correctly found that Elliott's, quote, yeah, end quote, was enough for officers to reasonably believe that the search was consensual. But even if his, quote, yeah, end quote, did not amount to consent, officers had probable cause to search his car after Elliott voluntarily told officers that he might have a marijuana pipe in the car. That answer was nonresponsive to whether or not he can search his car. That was a voluntary statement. And based on that statement, there was a fair probability that contraband would be found in Elliott's car. Elliott suggests that officers, that there was three officers who were bigger than Mr. Elliott, who had, in his brief, he suggests that the officers had their hands on their guns. But that's simply not true. There is no indication in the body camera footage from that day that officers had their weapons drawn or their hands on their weapons. The video evidence instead shows that this was a very calm interaction. The interaction before the gun was ultimately found, and he was, in fact, at that point, read his marijuana rights, lasted for about six minutes. And there's no evidence of any police, a corrosive police activity during those six minutes to suggest that those statements were anything but voluntary.  Elliott also argues that the search warrants for electronic storage devices and his residence lacked probable cause. He also argues that he was entitled to a Franks hearing. The district court correctly found that probable cause supported both of those warrants and that Elliott failed to meet the requirements for a Franks hearing. The affidavit in support of the search warrant for the USB drives relied on Hannon and Anderson's reports to law enforcement that they had viewed child pornography on a USB drive. In challenging the search warrant for the USB drive, Elliott contends that Anderson didn't actually corroborate Hannon's report. According to Elliott, Anderson didn't actually see the images herself and was simply repeating what Hannon told her, but that's simply not true. Anderson stated that she personally viewed the child porn on the devices, and Officer Grayson's report on page three specifically notes that.  Detective Bierstrom's report, or affidavit rather, relied on these reports and also say that, quote, Together, those reports were enough to demonstrate a fair probability that evidence of a crime would be contained on the drives. Probable cause also supports the search warrant for Elliott's residence. Elliott's challenge to this warrant is based largely on his challenges to the search of his car and his claim that the USB warrant lacks probable cause. For the reasons already discussed, those challenges fail. Moving on then to the issue of whether or not Mr. Elliott was entitled to a Franks hearing. Elliott argues that Detective Bierstrom failed to include information regarding Anderson and Hannon's friendship and failed to include their criminal histories in his affidavits. The district court correctly found that Elliott failed to make a substantial showing needed to obtain a Franks hearing. As an initial matter, both affidavits did in fact state that Anderson and Hannon were friends. In the USB warrant, that's on page four, and in the warrant for the residence, that's on page seven of Detective Bierstrom's affidavits. With respect to the omission of criminal histories, Elliott failed to make the required preliminary showing. He didn't point to any evidence at all that Detective Bierstrom knew that these women had prior criminal histories. Instead, Elliott argues that Detective Bierstrom should have known, but this court has held that what an officer should have known is insufficient to rise to the level to obtain a Franks hearing. But even if Elliott could have shown that the omission was deliberate or reckless, Elliott failed to show that probable cause would have been defeated if the criminal histories had in fact been included in the affidavits. As this court noted in United States v. Scott, probable cause is not defeated by a failure to include an informant's criminal history if that information is at least partly corroborated. And here the information was corroborated in both search warrants. The USB drive warrant relied on Hannon's report as corroborated by Anderson, and the residential search warrant relied on those reports again, as well as the information obtained on the February 4th interaction with law enforcement. And then Detective Bierstrom's own observations of child porn on the USB drive. Unless the court has any further questions, the government would rely on its brief for the remaining issues and respectfully request that the court affirm the district court's order and sentence. Hearing no further questions, thank you. Mr. Carr. I'm going to pick up where we left off with the warrants there. The issue is that the government continues this ruse that the warrant for the USB drives was corroborated by Ms. Anderson. While that might be the case, that's not in the affidavit. And the affidavit is the only thing that matters, because the affidavit is the only thing the court has to go off of the issuing magistrate. The issuing magistrate does not know about some other police report that exists in some other file. In the actual affidavit itself, there's no allegation that Ms. Anderson has actually seen the images herself. There's the bare assertion of Ms. Hannan that provides us with the probable cause. Furthermore, we know because we can see the special agent Smith's report, that that information, Detective Bergstrom would have reviewed that same information in Officer Allen's report. And he indicates that he reviewed that report in the affidavit. There's absolutely a showing that he had actual knowledge of this criminal history. And had this criminal history been included, it would be similar to the United States v. Hall, and it would have defeated that affidavit's probable cause. So for that reason, Your Honors, we would ask that you overturn the district court's decision. Thank you very much, Mr. Carr. The case's submitted argument and briefing has been very helpful, so thank you very much. Mr. Carr, thank you very much for your willingness to serve on the CJA panel and take this CJA appointment. It's very, well, it's actually essential to the administration of justice, and the court deeply appreciates your service. Thank you.